IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DENNIS LEE BAKKE,                                         OPINION AND ORDER
                              Plaintiff,
                                                              21-cv-178-bbc
            v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security,

                        Defendant.
            .
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Dennis Lee Bakke is appealing a decision of the Acting Commissioner of

Social Security denying his application for disability insurance benefits under the Social

Security Act. The administrative law judge (ALJ) hearing the case determined that plaintiff

had a number of severe impairments but could still perform work in the national economy.

Plaintiff challenges this decision on a number of substantive and procedural grounds, but,

as discussed below, I find none of his arguments persuasive. Accordingly, I am affirming the

acting commissioner's decision.

The following facts are drawn from the Administrative Record (AR), dkt. #11.

---

[1]The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as
acting commissioner.

1

BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on January 16, 2019, alleging disability beginning on May 1, 2018, when he was 46.  His claim was denied initially on April 12, 2019 and upon reconsideration on August 14, 2018.  Thereafter, a hearing was held on August 19, 2020 by telephone, with the agreement of plaintiff and his counsel.  Plaintiff sought to establish that he was no longer able to engage in substantial gainful activity and had not been so engaged since May 1, 2018 through his last insured date of March 31, 2020.

A. <u>Medical Evidence</u>

Plaintiff alleges that during the relevant period, 2017-20, he suffered from the following medical problems:

- lumbar radiculopathy,

- lumbar degenerative disc disease

- status-post lumbar fusion

- lumbar neural foraminal stenosis

- multilevel lumbosacral spondylosis with radiculopathy

- multilevel lumbosacral facet arthropathy

On five occasions, Dr. David Junker gave plaintiff foraminal injections to treat his problems.  They were helpful to him at first, but eventually failed to provide him durable relief.  He told this to Dr. Mark Dekutoski, a surgeon, on April 6, 2018, when he saw him

on referral for a complaint of back and leg pain.  AR 305-09.

 On examination, Dr. Dekutoski  found that plaintiff had a normal gait and station, could heel and toe walk, ambulate without an assistive device, and with normal strength in his cervical, thoracic, and lumbar trunk.  At the time, plaintiff was 73 inches tall and weighed 315 pounds. AR 307-10.  Dr. Dekutoski ordered lateral radiographs of plaintiff's thoracolumbar spine.  ARr 3-4.

Because plaintiff had worked in heavy construction and had later switched to beef farming, Dr. Dekutoski explained  the different procedures that could be employed to get him back to "pretty heavy labor activities once he is healed." AR 310. On May 1, 2018, Dr. Dekutoski performed extensive surgery on plaintiff:  a lateral lumbar interbody fusion, left transforaminal decompression, and posterior instrumented fusion. AR 406.  Two days later, plaintiff was released from the hospital.  AR 405.  Plaintiff had nine physical therapy sessions following his May 2018 operation, but discontinued therapy on his own in July 2018.  AR 508.

On January 15, 2019, plaintiff saw Dr. Dekutoski for a follow-up visit.  Plaintiff said he had been farming in November and December and noticed a lot of pain the next day.  AR 499.   On examination, plaintiff had full strength in his normal extremities, with normal reflexes, sensation, and range of motion.  AR 502.  Dekutoski also noted that plaintiff had normal strength in his spine, had normal gait and station, and could walk on his heels and toes.  AR 503.  The doctor noted plaintiff's "profound deconditioning," saying he would benefit from "really working on further rehab, daily activity, continued weight loss."  AR

505.  He scheduled a follow-up visit in three months and recommended that plaintiff resume physical therapy.  AR 505.

In February 2019, plaintiff resumed physical therapy with physical therapist Heather Vogel.  Plaintiff reported that he was selling his farm and would like to pursue other work but was unsure what he could do because he felt extremely limited in his activities.  AR 508. Plaintiff complained of constant back pain that was centrally located, and numbness and pain in his left thigh.  He said his pain was aggravated by sitting for more than an hour or more, sitting without a back support, or standing or walking for more than an hour.  He also reported having trouble putting on his shoes and socks and difficulty doing his farm chores because of the pain and numbness in his left leg.  AR 509.  Vogel observed that plaintiff had significant cramps and discomfort in his lower back with all exercises, noting that he had a severely deconditioned trunk.  She recommended that plaintiff receive physical therapy two to three times a week for 10-12 weeks.  AR 512.

On March 4, 2019, plaintiff saw Vogel again and told her he was continuing with his stretches at home, as instructed, and was engaging in activities such as lifting and driving his tractor as he had things he needed to do around his farm.  AR 529.  On March 11, 2019, he told Vogel that the previous week had been hard for him because of the sale of his farm and the activity associated with the sale, but he rated his pain that day as a 3-4 out of 10.  AR 531.  The following week, he reported having more pain and left leg numbness after tromping in the deep snow to tap some maple trees.  AR 538.  On March 25, 2019, he told Vogel again that he had been out on snowshoes trying to tap maple trees and was having

4

difficulty walking on uneven ground.  AR 584.  On April 15, 2019, he reported having increased pain and cramps in his leg after helping collect sap on Saturday, when he carried two half-full five gallon buckets in the woods.  AR 571.  Three days later, he told Vogel he was doing much better, and had been able to do some canning.  He estimated that he could walk on level ground for 45-60 minutes, walk on uneven ground for 15-20 minutes, lift 20-25 pounds ten times in a row, and lift 50 pounds occasionally.  AR 568.  In her assessment, Vogel noted that plaintiff was having intermittent flare-ups, but they were occurring less frequently and he was recovering faster; she also noted that plaintiff was continuing to "perform moderate to heavy labor at home," noting that he had plans to change a tire immediately after therapy that day.  AR 569.  Although Vogel noted in May that she anticipated that plaintiff would need therapy for another two to three months, the record does not show any visits after May 6, 2019.

On April 26, 2019, plaintiff saw Dr. Andrea Peterson, D.O., a physical medicine and rehabilitation specialist, for his low back pain and weakness, numbness and cramping in his left leg.  AR 561-62.  Plaintiff said his pain level was typically a 3 out of 10 and that he was able to ambulate on his own, but at times needed help getting his socks and shoes on in the morning.  Dr. Peterson prescribed baclofen at bedtime for the muscle cramping and ordered a new lumbar MRI and an EMG of the left leg.  AR563.

Plaintiff saw Dr. Peterson in follow- up on May 21, 2019.  AR 552.  The doctor noted that the EMG showed that plaintiff had a left L5 radiculopathy and she arranged for an injection by Dr. Junker, AR 553, which was administered on June 24, 2019.  AR 616-19.

At a follow-up appointment with Dr. Junker, plaintiff expressed disappointment that the effect of the injections was not as sustained as he had hoped and he was eligible for only three procedures a year. AR 622. Dr. Junker recommended increasing his Lyrica from 100 mg twice a day to 150 mg twice a day. Id.

In August 2019, Dr. Peterson ordered a lumbar CT myelogram to evaluate whether plaintiff had a left L5 impingement, noting that the May 2019 lumbar MRI had been inconclusive because of the hardware in plaintiff's spine. AR 624. After undergoing the myelogram, plaintiff saw Dr. Dekutoski on September 6, 2019. Reviewing the CT findings and other imaging studies, Dr. Dekutoski assured plaintiff that his fusion looked stable, that there was no need for hardware removal, and that nothing was pinching plaintiff's nerves. AR 637. The doctor diagnosed plaintiff with "lumbosacral dorsalgia," a medical term for lower back pain, which he noted was made more challenging by plaintiff's weight of 330 pounds. Dr. Dekutoski noted that plaintiff had been advised in the past to lose weight, adding that bariatric surgery might benefit him substantially. AR 638.

In October 2019, plaintiff saw Amelia Zellner, a nurse practitioner, for medication management. Plaintiff said he had been taking three Lyrica pills before bed, which helped him sleep better and wake up with minimal pain and stiffness. He said he had sold his beef farm in the spring because he could not keep up with the physical demands of the farm. AR 640. Plaintiff asked Zellner for weight loss suggestions, noting that he understood his weight was contributing to his back pain. Zellner suggested to plaintiff some physician-monitored diet programs that he could try, AR 641, but there is no evidence that plaintiff ever did so.

On February 6, 2020, plaintiff saw Zellner again for a yearly physical. AR 643. At this time, his weight was 336 pounds. According to Zellner's note, plaintiff said his pain was under "reasonably good control" and he was able to do most of the things he wanted to, including hunting deer, helping with farm work, and going into the woods on snowshoes to tap maple trees. AR 644. He denied having new muscle or joint pain, swelling or stiffness, but did say he had persistent low back pain and left lower limb radiculopathy symptoms that were well controlled with medication. AR 645. Zellner noted that he had no gait abnormalities and had normal muscle strength throughout. AR 646.

On April 2020, Dr. Peterson had a telephonic visit with plaintiff to follow up on his left lumbar radiculopathy. AR 652. Plaintiff said he had numbness in his left leg, which made his legs feel weak and made it difficult to walk on uneven surfaces. He said his pain was aggravated by sitting, bending, frequent lifting, lying down, standing, walking, and weather changes, and was alleviated by changing position about every 30 minutes. Plaintiff said that he had seen a surgeon at the University of Wisconsin, who did not think further surgery was indicated. Dr. Peterson assessed plaintiff as having chronic left lumbar radiculopathy, chronic low back pain, and status post lumbar fusion. She issued permanent work restrictions limiting him to working only four hours a day; lifting no more than 30 pounds, and then only occasionally; no ladders; and said he needed the ability to alternate between sitting, standing, and walking as needed. AR 651.

Dr. Peterson had an in-person visit with plaintiff on June 16, 2020. AR 655. He said his pain was variable, rating it a 3 out of 10 on that day. She observed that he had a normal

gait, was able to heel and toe walk, had 5/5 strength in all major muscle groups in his lower extremities, had adequate range of motion in his lumbar spine but had some pain, and he had diminished sensation and reflexes on the left leg. AR 656. She advised plaintiff to continue his medications and return in six months. AR 656.

In July 2020, plaintiff saw Dr. Vivekananda Gonugunta, a neurosurgeon, for an opinion concerning his continued left thigh numbness, persistent low backache, exacerbated by cold weather, and his inability to perform any major activities. AR 661. The doctor assessed plaintiff as a well-built, well-nourished, and significantly obese 48-year-old man, with "quite abnormal" posture (leaning forward and slightly to the right), and significantly limited range of motion in the lumbar spine. AR 661. Dr. Gonugunta also found that plaintiff walked with an antalgic gait, favoring his right side. Id. However, the doctor noted that he could see no problems with the 2018 surgery and that plaintiff's persistent low back pain and leg numbness were not unexpected after multilevel fusion surgery. In fact, noted Dr. Gonugunta, plaintiff was "definitely better than before surgery and he is just concerned that his [sic] unable to return to his normal self." AR 662. He further noted that plaintiff was mainly interested in getting disability and not looking to have another surgery, adding: "He just wants reassurance that there is nothing serious going on in the spine which I did." AR 662.

## B. State Agency Medical Findings

State agency medical consultant Dr. Marc A. Young reviewed the record and provided

an assessment of plaintiff's limitations on April 11, 2019.  AR 70-76.  The doctor concluded that plaintiff had the residual functional capacity for light work (*i.e.* he could frequently lift or carry 10 pounds and could sit or stand/walk for a total of about 6 hours each in an eight-hour workday), except that he could bend at the waist only occasionally and should avoid concentrated exposure to hazards such as machinery or heights.  AR 73-74.  Summarizing the objective findings, Dr. Young noted that although plaintiff had initially reported that his pain had improved after his surgery, he had reported in December 2018 that it had become more intense; plaintiff noted an improvement, however, after being prescribed Lyrica. Young also noted that physical examinations showed that plaintiff had pain with palpation, was obese, and had an antalgic gait, but had essentially normal strength and had told his physical therapist on March 18, 2019 that he had tapped trees and was tromping around in the deep snow in the woods.  AR 73.

At the reconsideration level, state agency doctor Sai Nimmagadda reviewed plaintiff's current medical evidence, which included the March 2019 EMG study finding evidence of an active left L5 radiculopathy.  Dr. Nimmagadda agreed with Dr. Young that plaintiff could meet the exertional demands of light work, but found that he had additional postural and environmental limitations.  Dr. Nimmagadda stated that his conclusions were based on all of the file evidence, including the medical and functional information.  AR 84-86.

## C. Administrative Hearing

After his request for benefits was denied, plaintiff asked for and was granted a hearing

before an administration law judge, which was held on August 19, 2019, by telephone because of the pandemic. All of the parties, including the vocational expert, were in separate locations. ALJ Mikel Lupisella presided; plaintiff was represented by counsel.

In response to questions from the ALJ, plaintiff testified that he was born on October 24, 1971, had graduated from high school in 1990, and had then gone to work for Liberty Homes as a construction laborer. Later, he had worked as a farmer. AR 39. Plaintiff said that he had arthritis in his back and it made him sore when he sat or stood too long at any time, such that he had to change positions frequently throughout the day. AR 43. He said he could "still get around, but it's tough going and slow." Id. Although he was not pain free, he said his medications helped, with no adverse side effects. AR 45.

Plaintiff told the ALJ he had enjoyed tapping trees for maple syrup, but could no longer do so because it required too much twisting and trying to walk in deep snow and on uneven ground. AR 57. He said he now needed a cane for walking, had given up deer hunting, and had sold the farm on which he raised beef cattle. AR 60.

The ALJ called a vocational expert, Charles McBee, who assessed plaintiff's prior jobs of construction laborer and livestock farmer as "heavy," as plaintiff had performed them. In the expert's opinion, plaintiff would not be able to perform his previous jobs, but would be able to perform jobs at the light exertional level, such as a merchandise marker, DOT 209.587-304; cleaner, DOT 323.687-014; or sorter, DOT 222.687-014. The expert said that the specific vocational preparation (SVP) for each of these three jobs was 2 and there were at least 40,000 jobs in each category, with 200,000 for the job as cleaner.

10

At the sedentary level, the vocational expert identified potential jobs such as information clerks, DOT 237.367, inspectors, DOT 739.687-046, and document preparers, DOT 249.587-018, of which there were at least 57,00 jobs in the national economy for each category, and all SVP 2.  AR 63-64.

### D. ALJ Decision

Following the hearing, the ALJ issued his decision, finding plaintiff not disabled under the five-step inquiry for evaluating disability claims such as his.  20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ found that plaintiff met the insured status requirement of the Social Security Act through March 31, 2020, which meant he had to establish disability on or before that date if he were to be entitled to a period of disability and disability insurance benefits.  AR 18.

At steps two and three, the ALJ found that plaintiff had not engaged in substantial gainful activity from his alleged onset date of May 1, 2019 through his date last insured of Mach 31, 2020, and he had four severe impairments: degenerative disc disease; lumbar radiculopathy; obesity; and status-post lumbar fusion L2-L5.  20 C.F.R. § 404.1520(c). Although these impairments were severe and caused more than minimal functional limitations of plaintiff's ability to perform basic work activities, the ALJ found that none of them met or medically equaled the severity of a listed impairment under 20 C.F.R. Pt. 404, App. 1, whether they were considered alone or in combination.

To determine whether plaintiff could return to his past relevant work at step four, the

ALJ evaluated plaintiff's residual functional capacity.  The ALJ found that plaintiff had the residual functional capacity to perform light work, except that he could not climb ladders, ropes, or scaffolds; could climb ramps and stairs only occasionally; could occasionally balance on narrow, slippery, or erratically moving surfaces; could occasionally stoop, kneel, crouch, or crawl; and could only be exposed occasionally to hazards such as unprotected heights or dangerous moving machinery.  AR 19.  In reaching this conclusion, the ALJ acknowledged that it was reasonable to find that plaintiff's degenerative disc disease, lumbar radiculopathy, obesity, and status-post lumbar fusion caused him some degree of functional limitation, but these problems were not as intense, persistent, and limiting as plaintiff's statements about them suggested, for the following reasons:

- while showing "some abnormal signs," plaintiff's imaging and examinations were, overall, "generally unremarkable," AR 20-21;

- plaintiff's post-surgery treatment consisted only of medications, physical therapy, and injections, AR 21;

- plaintiff's providers did not recommend any further surgery but only medication management and weight loss, AR 22-23; and

- in February 2020, plaintiff reported his pain was under reasonably good control and he was able to do most things he wanted to do, including helping with farm work, hunting, and snowshoeing into the woods to collect sap for maple syrup, AR 22.

In the ALJ's view, this evidence was most consistent with the opinions of Dr. Young and Dr. Nimmagadda, the state agency medical consultants, who had concluded that plaintiff had the residual functional capacity to perform light work, with some postural and environmental restrictions, and inconsistent with the opinion of Dr. Peterson, who had

found that plaintiff could lift only occasionally, wound need to alternate positions between sitting, standing or walking as needed, and could work only 4 hours a day.  AR 23-24.  In addition, the ALJ noted that Dr. Peterson did not cite to any medical evidence, progress notes, or abnormal signs that she relied on for her conclusions.  AR 24.

At step four, the ALJ determined that plaintiff had been unable to perform any past relevant work through the date he was last insured, 20 C.F.R. § 404.1565, but had the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), with certain exceptions.  Moreover, because plaintiff had the ability to perform light work, he was capable of doing sedentary work as well.  29 C.F.R. § 404.1567(b) ("If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or inability to sit for long periods of time.").

At step five of the analysis, the ALJ took into consideration plaintiff's age, education, work experience, and residual functional capacity and determined that jobs existed in significant numbers in the national economy that he could perform, citing the vocational expert's testimony as support for his conclusion.  Accordingly, the ALJ concluded that plaintiff had not been under a disability from the alleged onset date of May 1, 2018 through March 31, 2020, the date on which he was last insured.


OPINION

Under the Social Security Act, the court is limited in reviewing the commissioner's

final determination; 42 U.S.C. § 405(g)  provides that the findings of the commissioner as to any fact shall be conclusive if supported by "substantial evidence." "Substantial evidence is more than a 'mere scintilla'; it consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). A person challenging an adverse decision by an ALJ has the burden of showing that the ALJ's findings were not supported by substantial evidence, not simply that there is evidence from which the ALJ could have reached the opposite conclusion. Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2010).

In this case, plaintiff challenges the ALJ's conclusion that he retains the residual functional capacity for light work. Four matters are in dispute:

- whether the ALJ was required to call a medical expert to interpret plaintiff's August 2019 CT myelogram;

- whether the ALJ erred in failing to properly assess the persuasiveness of Dr. Peterson's opinion, as required by the SSI regulations;

- whether the ALJ failed to properly evaluate plaintiff's subjective complaints; and

- whether the ALJ erred in evaluating plaintiff's obesity.

Plaintiff also raises a number of procedural challenges, which I address below.

A.  August 2019 CT Myelogram

Plaintiff argues that the ALJ erred in relying on the opinions of the state agency physicians because those opinions did not take into account plaintiff's August 2019 CT myelogram, which was conducted after the state agency consultants rendered their opinions. Plaintiff is correct in saying that an ALJ may not "play doctor" and act as his own medical

14

expert.  See, e.g., Akin v. Berryhill, 887 F.3d 314, 317 (7th Cir. 2018) ("[W]ithout an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."); Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014)  ("The administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence.").  However, the ALJ must consult an expert only for those records that "require medical expertise to interpret."  Ross v. Berryhill, No. 18-cv-215-jdp, slip op. at 4 (W.D. Wis. Dec. 14, 2018).  In Schuelke v. Saul, No. 18-CV-833-JDP, 2019 WL 2514825, at *2 (W.D. Wis. June 18, 2019), for example, Judge James Peterson found remand unnecessary because the ALJ's record citations showed that he was "not looking at the raw images and test results and analyzing them himself," but rather was relying on analyses offered by plaintiff's treating physicians.

In this case, the ALJ recited the findings of the August 2019 CT myelogram (referred to by the ALJ as an "MRI"), along with other diagnostic studies, finding them "generally unremarkable."  AR 20.  Although I agree with plaintiff that the ALJ probably strayed outside his expertise to the extent he purported to interpret the CT myelogram, any such error was harmless in this case.  Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (harmless error applies to judicial review of administrative decisions).  As noted above, the CT myelogram was reviewed, in-depth, by plaintiff's back surgeon, Dr. Dekutoski, and a neurosurgeon, Dr. Gonugunta, neither of whom saw anything of concern about the findings. In fact, after reviewing the study,  Dr. Dekutoski diagnosed only lower back pain in plaintiff,

and continued to recommend that he engage in conditioning exercise and lose weight.

In other words, the doctors' reports support the ALJ's conclusion that the CT myelogram was "generally unremarkable," and plaintiff cites no evidence to suggest otherwise.  Accordingly, remanding this case to have yet another medical expert review the study would be pointless.

## B.  Dr. Peterson's Opinion

Plaintiff contends that the ALJ failed to adhere to the agency's regulations for evaluating medical opinions when he assigned more weight to the state agency physicians' opinions than to the much more restrictive opinion of Dr. Peterson.  Under the new revised regulations, which apply to this case, a "medical opinion" is "a statement from a medical source about what an applicant can do despite his impairments and whether the applicant has impairment-related limitations or restrictions with respect to his ability to perform physical, mental, or other demands of work activities, or adapt to environmental conditions." 20 C.F.R. § 404.1513(a)(2).  The term "prior administrative medical findings" refers to the evidence provided by the reviewing state agency's medical and psychological consultants, who in this case are Dr. Young and Dr. Nimmagadda.  20 C.F.R. § 404.1513a.

In applying these new regulations, an ALJ is to focus on the persuasiveness of the medical opinions or prior administrative medical findings relating to the plaintiff, using five factors: supportability, consistency, relationship with the plaintiff, specialization, and other factors.  20 C.F.R. § 404.1520c(a)-(c).  The ALJ is required to explain his consideration of

only the first two factors.

In this case, the ALJ complied with the regulation and addressed the first two factors, finding that Dr. Peterson's April 14, 2020 opinion was not persuasive because it was neither well supported nor consistent with the overall record. First, the ALJ noted that Dr. Peterson did not refer to any specific medical evidence or abnormal signs on which she had relied in forming her opinion. Second, the doctor's opinion was inconsistent with the overall record, including plaintiff's February 2020 statement to NP Zellner that his pain was under reasonably good control and he was able to do most things he wanted to do, including tapping maple trees, hunting, and performing some farm work. It was also inconsistent with the objective evidence and with plaintiff's course of treatment.

Plaintiff takes issue with both of these findings. First, he argues that Dr. Peterson's opinion was supported by her notes from her April 14, 2020 phone visit with plaintiff, which summarized plaintiff's symptoms, treatment history, and the findings of the imaging studies. Contrary to plaintiff's argument, however, the fact that the EMG study showed a L5 radiculopathy and the CT myelogram showed changes in plaintiff's spine consistent with his having had a fusion are not evidence of his limitations. As the ALJ observed, Dr. Peterson did not explain her reasoning for the limitations she proposed, and she made no reference to specific progress notes or abnormal signs upon which she had relied to support the work restrictions. In fact, on the day she provided her opinion, she did not examine plaintiff but spoke with him by telephone. Because the ALJ's reasoning is sufficiently clear and consistent with the record, I see no basis to disturb it.

17

Second, plaintiff argues that Dr. Peterson's opinion of plaintiff's limitations was consistent with other evidence in the record, namely, plaintiff's testimony at the hearing and the objective findings. Once again, however, plaintiff simply cites the jargon-filled medical imaging reports without explaining why these reports showed greater limitations than the ALJ found. Moreover, he fails to note that Dr. Dekutoski reviewed those studies and did not see anything in them that was particularly alarming or unusual given plaintiff's surgical history. Likewise, plaintiff cites no evidence to contradict the ALJ's conclusion that plaintiff's physical examinations, while occasionally documenting some abnormal signs, were generally unremarkable.

Primarily, plaintiff takes issue with the ALJ's reliance on NP Zellner's February 6, 2020 note, saying that the information in that note "seems to be factually wrong," as well as inconsistent with her previous note in October 2019, in which she noted that he had had to sell his farm because he could not keep up with the work. In addition, he argues that the ALJ's reliance on the February 2020 note ignores plaintiff's testimony that, although he tried hunting and tapping maple trees, he no longer engages in those activities because they are too hard on his back and aggravate his pain. These arguments are not persuasive. First, Zellner's notes are not necessarily inconsistent: Zellner's February 2020 note said only that plaintiff was able to engage in "farm work," which could have been on someone else's farm. Moreover, even accepting plaintiff's testimony that he no longer does farm work, taps maple trees or goes hunting, plaintiff attributed his difficulties with those activities largely to the uneven ground, which the ALJ accounted for in the residual functional assessment. Finally,

plaintiff has not denied that he told Zellner that his low back and left leg pain were well controlled with medication and that he was able to do most of the things he wanted to do. For all these reasons, I find no error by the ALJ in relying on Zellner's February 2020 note, either as a reason to discount Dr. Peterson's opinion or, more broadly, as support for her conclusion that plaintiff was capable of performing either light or sedentary work.

Finally, plaintiff contends that the new medical evidence regulations "place a greater level of articulation upon [an] ALJ when assessing medical opinions in general," Plt.'s Br., dkt. # 15, at pp. 31-32 (citing cases).  Although I do not share plaintiff's view of the case law, I am persuaded that the ALJ in this case satisfied the articulation requirement of 20 C.F.R. § 404.1520c(a).  The ALJ explained how he considered the factors of supportability and consistency in assessing the persuasiveness of Dr. Peterson's opinion, and cited evidence from the record to support these conclusions.  Because the ALJ built an "accurate and logical bridge" between the evidence and his conclusion, her assessment of Dr. Peterson's opinion must stand.  Beardsley v. Colvin, 758 F.3d 834, 837 (7th Cir. 2014) (ALJ must build accurate and logical bridge between evidence and result to afford claimant meaningful judicial review of administrative findings).

## C.  Evaluation of Plaintiff's Subjective Complaints

In plaintiff's opinion, the ALJ erred in rejecting his subjective complaints of pain when he found that he could perform a limited range of light work.  An ALJ must consider a claimant's subjective complaints of pain if the claimant has a medically determined

impairment that could reasonably be expected to produce that pain. 20 C.F.R. § 404.1529(c)(1). An ALJ's findings about a plaintiff's testimony and allegations regarding his symptoms are entitled to great deference, and should be upheld unless patently wrong. Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017). Not all of the ALJ's reasons have to be sound as long as enough of them are. Halsell v. Astrue, 357 Fed. App'x. 717, 722-723 (7th Cir. 2009).

Here, the ALJ found that plaintiff's subjective symptoms were "not entirely consistent with the medical evidence and other evidence in the record[.]" AR 20. In reaching this finding, the ALJ considered the evidence related to plaintiff's inability to farm and noted plaintiff's many complaints about his physical difficulties. AR 21. For example, in a function report plaintiff filed with the Social Security Administration, plaintiff had set out the limitations he had with lifting, squatting, bending, standing, walking, sitting, and stair climbing, having back pain that made it difficult for him to perform any of these activities, needing to take naps during the day, having problems with walking or sitting or both for long periods, and experiencing numbness in his left leg. AR 20. The ALJ also acknowledged plaintiff's hearing testimony that he could sit for one to two hours and stand for 45 minutes before needing to change positions, needed to lie down throughout the day, could lift a bag of groceries, fell occasionally and had experienced bad days when he could not get out of bed. Id.

The ALJ took into account plaintiff's asserted symptoms, but was not persuaded that plaintiff's statements about their intensity, persistence, and limiting effects were entirely

consistent with the medical evidence. As the ALJ explained, the doctors' imaging and other studies did not support plaintiff's alleged residual functional limitations. Generally, the studies revealed only mild, unremarkable results, some of which were "expected postoperative changes" resulting from the surgery performed by Dr. Dekutoski in May 2018. In addition, the ALJ noted that the post-surgery treatments plaintiff received were limited to medication management, physical therapy, and injections.

Although plaintiff's argument is hard to follow, he seems to complain primarily that the ALJ's analysis was too perfunctory and did not address each of plaintiff's statements at the hearing. However, the ALJ did not need to explain why each of the claimant's statements deserved little weight. Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012). He was required only to give reasons sufficient to provide a fair sense of how he assessed plaintiff's testimony and statements. Social Security Ruling (SSR) 16-3p. The ALJ did that here. He explained that plaintiff's statements were unsupported by the objective medical evidence, his relatively conservative course of treatment after his surgery, his statements regarding the effectiveness of medication, and his reported ability to engage – at least on occasion – in activities more strenuous than the ALJ's RFC assessment. Those reasons were sufficient to justify discounting plaintiff's subjective complaints, just as they were sufficient to warrant discounting Dr. Peterson's opinion.

D. Evaluation of Plaintiff's Obesity

Finally, plaintiff argues that the ALJ's RFC finding failed to account for the impact

that his obesity would have on his other impairments or on his ability to perform light work.

Ruling 02–1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on

his underlying conditions (even if the obesity is not itself a severe impairment) when arriving

at a claimant's RFC.   SSR 02–1p; Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir.

2006); Clifford v. Apfel, 227 F.3d 863, 873 (7th Cir. 2000).   The ALJ found that plaintiff's

obesity was a severe impairment, but concluded that it was not an impairment that was

disabling or that met or medically equaled a listing, either alone or in combination with

other impairments.   As for the effect of plaintiff's obesity on his RFC, the ALJ wrote:

> The claimant has a Body Mass Index over 30.  The claimant is clinically obese.
> I have considered how weight affects his ability to perform routine movement
> and necessary physical activity within the work environment.  I am aware that
> obesity is a risk factor that increases an individual's chances of developing
> impairments in most body systems.  Obesity can cause limitation of function
> and the effects of obesity may not be obvious.  The combined effects of
> obesity with other impairments may be greater than might be expected
> without the disorder.  I have considered any added or cumulative effects the
> claimant's obesity played on his ability to function, and to perform routine
> movement and necessary physical activity within the work environment.

AR 23.

Plaintiff argues that this discussion is largely "boilerplate language" that fails to

demonstrate how, if at all, the ALJ accounted for plaintiff's obesity in fashioning the RFC.

I agree that the ALJ's discussion is largely conclusory and short on analysis.   Nevertheless,

this error was harmless.   Notably, plaintiff fails to identify any medical records or other

evidence that supports specific limitations caused by obesity over and above those found by

the ALJ.   At best, plaintiff argues that, given his morbid obesity, it would be reasonable to

believe "that the extra body-weight would cause a significant reduction in [his] ability to

frequently lift and carry objects throughout the workday[.]" Br. in Supp., dkt. #15, at 51. However, even accepting for the sake of argument that the ALJ should have found that plaintiff was limited to sedentary work because of his obesity, it would not change the outcome.  In addition to identifying thousands of light exertional jobs that fit the ALJ's operative hypothetical, the vocational expert identified thousands of sedentary jobs as well. Plaintiff has cited no evidence, and has developed no argument, that his obesity would require additional work restrictions that would prevent him from performing work at the sedentary level.  Shumaker v. Colvin, 632 Fed. App'x 861, 867-78 (7th Cir. 2015) (finding no harmful error where claimant "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments.").  See also Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (merely speculating about effect of one's weight on the ability to work does not amount to reason for remand of plaintiff's case).

## E.  Procedural Challenges

Finally, plaintiff argues that this case must be remanded because of a number of procedural or structural errors, namely:  (1) the Appeals Council ignored new and material evidence submitted by plaintiff's wife; (2) the ALJ failed to offer an opportunity for plaintiff's attorney to make opening statement or a final closing argument; and (3) the ALJ was not constitutionally authorized to render a decision in light of the Supreme Court's decision in Selia Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183 (2020).  As to

this last argument, I have previously considered and rejected the same constitutional challenge in <u>Kreibich v. Kijakazi</u>, 2020-cv-1045-bbc, 2/23/22 Op. and Ord., dkt. #25, pp. 16-18.  I reject it for the same reasons in this case, without further discussion.  Plaintiff's first two arguments are also without merit.

1. <u>Appeals Council's refusal to entertain evidence from plaintiff's wife</u>

After the ALJ issued his decision, plaintiff submitted a December 2021 statement from his wife, Sheila Bakke, stating that plaintiff did not do any farm work after their own farm was sold in April 2019 and did not tap maple trees or go snowshoeing in 2020.  AR 8.  Sheila Bakke also described plaintiff's inability to sit for more than two hours before needing to elevate his feet near waist level, and that once his feet were elevated, he could sit for about four hours.  In plaintiff's view, the Appeals Council erred by not giving any attention to this evidence when, according to plaintiff, it was new and material.

It does not appear that Ms. Bakke's filing met the criterion for acceptance by the Appeals Council that the information submitted be material, but even if it did, plaintiff is not entitled to remand unless he shows that the Appeals Council erred.  <u>Accord</u> <u>Limberg v. Kijakazi</u>, No. 21-CV-189-BBC, 2022 WL 406057, at *11 (W.D. Wis. Feb. 10, 2022) (finding it unnecessary to decide whether Appeals Council's decision was reviewable where plaintiff failed to show council erred in declining review).  He has not made that showing.  In her letter, Sheila Bakke essentially repeated plaintiff's hearing testimony, explaining when the farm was sold and denying that plaintiff had participated in tapping maple trees,

gathering sap, or snowshoeing in 2020, presumably to refute the statements in Zellner's February 2020 note.  As discussed previously, however, even if the testimony of both plaintiff and his wife were credited, it would not establish that the ALJ erred in relying on Zellner's note.  The ALJ did not find that plaintiff remained capable of those strenuous activities at the time he made his decision.  Moreover, he cited additional reasons that led to his conclusion that plaintiff was not too disabled to manage light work, such as his good response to medication, his relatively conservative post-surgery treatment, and the fairly unremarkable physical findings.  Therefore, the Appeals Council's denial was neither surprising nor erroneous.

## 2. ALJ's failure to offer opportunity for oral argument

Plaintiff seeks to have the case reversed because the ALJ violated due process by not allowing plaintiff's attorney to make an opening or closing argument at the administrative hearing. In support, plaintiff cites the Social Security Administration's Hearings, Appeals, and Litigation Manual ("HALLEX"), which states:

> During a hearing, an ALJ will provide the claimant and appointed representative, if any, reasonable time to present oral argument. Absent special circumstances, the ALJ will not fix a time limit on oral argument prior to the presentation of arguments. The ALJ will ensure all oral arguments are recorded and made a part of the record.
>
> After all hearing testimony has been presented, the ALJ will:
>
> > • Offer the claimant and appointed representative, if any, the opportunity to make a final oral argument at the hearing; and
> >
> > • If necessary, address assertions made during final oral

> argument by the claimant or appointed representative, if any, if
> the argument varies sharply with the evidence of record or if the
> argument raises new and relevant issues.

HALLEX § I-2-6-76, (https://www.ssa.gov/OP_Home/hallex-I-02/I-2-6-76.html, last visited

May 11, 2022).

Contrary to plaintiff's suggestion, the HALLEX "is designated as a guide rather than

a regulation." Dean v. Colvin, 585 F. App'x 904, 905 (7th Cir. 2014). The Seventh Circuit

has not yet addressed the issue, and "[c]ircuits are split over whether the HALLEX creates

enforceable rights." Davenport v. Astrue, 417 F. App'x 544, 547 (7th Cir. 2011) (collecting

cases) (discussing circuit split but not deciding the issue). Most courts, however, "hold that

HALLEX guidelines do not create any enforceable rights." Dardon v. Colvin, No. 12 C

50398, 2015 WL 1915606, at *5 (N.D. Ill. Apr. 27, 2015) (comparing Lockwood v.

Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1072 (9th Cir. 2010)) ("HALLEX does not

impose judicially enforceable duties on either the ALJ or this court."); Ferriell v. Comm'r of

Soc. Sec., 614 F.3d 611, 618 n.4 (6th Cir. 2010) (same); Power v. Barnhart, 292 F.3d 781,

785-86 (D.C. Cir. 2002) (same); DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir.

1998) (same) with Shave v. Apfel, 238 F.3d 592, 596-97 (5th Cir. 2001) ("This Circuit has

expressed a strong preference for requiring the social security administration to follow its

own internal procedures."). See also Mitchell v. Berryhill, No. 17 C 6241, 2019 WL

426149, at *8 n.7 (N.D. Ill. Feb. 4, 2019) ("[A]n ALJ's failure to follow instructions in the

HALLEX does not show reversible error."). Moreover, "no circuit has held that the HALLEX

creates constitutional rights because, of course, only the Constitution, not an agency's rules

or procedures, is the source of such rights." <u>Davenport</u>, 417 F. App'x at 547-48.

In any case, even if the HALLEX was enforceable, plaintiff has failed to show how he was harmed by the ALJ's alleged oversight.  Plaintiff does not say that he asked to make either or both arguments, although he was represented by counsel at his hearing, and he does not contend that the ALJ knew that he wished to be heard. Moreover, he does not articulate what arguments he would have presented had he been afforded the opportunity.  His request for remand, therefore, is denied.

## ORDER

IT IS ORDERED that the decision of Kilolo Kijakazai, Acting Commissioner of Social Security, denying plaintiff Dennis Lee Bakke's application for disability insurance benefits is AFFIRMED.

Entered this 16th day of May, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

27